**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA**

        **v.**                          **1:04-CR-588**
                                            **(GLS)**

**YAN DELOUYA,**

                       **Defendant.**

_____

**APPEARANCES:**               **OF COUNSEL:**

**FOR THE UNITED STATES:**

HON. GLENN T. SUDDABY       Terrence M. Kelly
United States Attorney           Assistant U.S. Attorney
445 Broadway
218 James T. Foley U.S. Courthouse
Albany, New York 12207-2924

**FOR THE DEFENDANT:**

Office of E. Stewart Jones       George E. LaMarche, III, Esq.
28 Second Street
Jones Building
Troy, New York 12181

**Gary L. Sharpe**
**U.S. District Judge**

**Decision and Order**

**I. Introduction**

Yan DeLouya, Anthony Plata and Darrell Grant (also known as David Cadorette), have been indicted for participating in a marijuana distribution conspiracy and for possessing with the intent to distribute fifty kilograms of marijuana in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(C). DeLouya moves to suppress statements he made to federal officers, and the warrantless seizure of evidence from two vehicles, from Cadorette, and from him. *See Dkt. No. 10*; FED. R. CRIM. P. 12(b)(3)(C). Although the court has considered DeLouya's motion, his supplemental submissions, the suppression hearing evidence, and a colloquy with counsel during the hearing, it is still left without a clear understanding of precisely what DeLouya seeks to suppress and his basis for doing so. *See generally United States v. Miller*, 382 F. Supp. 2d 350 (N.D.N.Y. 2005). Nonetheless, and for the reasons that follow, the motion is denied in its entirety.

**II. Facts**

Having considered DeLouya's burden of production, the appropriate burden of proof, the testimony of Senior Border Patrol Officer Parker and

2

Drug Enforcement Administration ("DEA") Agent Sinnigen, the suppression

hearing exhibits, the parties' submissions, and having resolved issues of

credibility, the court finds the following essential facts.  *See* FED. R. CRIM.

P. 12(d); *see also Miller*, 382 F. Supp. 2d at 361-363 (burden of production

and proof).

The United States Border Patrol investigates contraband smuggling

along this district's lengthy international border with Canada.  At 4:00 A.M.

on September 30, 2004, a hidden sensor disclosed an illegal border

crossing near the intersection of Lost Nation and Frontier Roads in Clinton

County.  Parker and his partner, Special Agent Montelongo, responded.

Because of his training, experience and familiarity with past

intelligence reports, Parker had information pertinent to his eventual

encounter with DeLouya and Cadorette before the alert sounded.  He knew

that there was a similar alert at the same location six months earlier, that

an illegal crossing was detected, that Cadorette was stopped in the vicinity,

and that Cadorette was bald and had a goatee.  He also knew the *modus*

*operandi* of drug smuggling operations.  He knew that they often involved

multiple people with assigned tasks.  A smuggler would transport drugs

across the border on foot from Canada while others waited in vehicles on

the American side.  Once across, the smuggler and drugs would be picked up by a confederate driving a primary vehicle.  Another confederate would drive a second car, or scout vehicle.  The scout vehicle would drive ahead of the primary vehicle looking for inland check points and routine police activity.  If the scout vehicle detected either, it would create a diversion, such as speeding, in order to occupy the police while the primary vehicle proceeded undetected.  Communication between the foot smuggler, the primary vehicle and the scout vehicle is essential.  Therefore, smugglers use not only cell phones, but walkie-talkies because cell phones are often inoperable in rural border areas.

When the sensor sounded, Parker drove to the border, and directed Montelengo to conduct surveillance at Dick's Country Store which was located three to four miles and ten minutes from the sensor.  Montelongo arrived at 4:15 A.M., and began his surveillance across the road from the store's public parking lot.  Within minutes, he saw a Ford minivan and Chevrolet Impala pull into the lot, and radioed his observations to Parker.  At Parker's direction, he crossed the road, exited his vehicle, and spoke with each vehicle's sole occupant both of whom were sitting in the vehicle with the ignition off.  DeLouya was the driver of the Impala, and told

Montelongo that:  his name was Yan DeLouya; he was a Canadian citizen;

he was returning to Manhattan from the casino; the driver of the other

vehicle was a traveling companion; and, they had stopped to rest at Dick's

(Statement One).  The other driver identified himself as David Cadorette,

and repeated the same story.  Located at the edge of Franklin County and

the Canadian border, the Akwesasne Mohawk Casino is relatively close to

Dick's Country Store, and is eight or nine hours by car from New York City.

After he spoke with the men, Montelongo resumed his surveillance

across the road, and radioed the substance of his conversations to Parker.

Parker asked Montelongo whether Cadorette was bald and had a goatee,

and when Montelongo responded affirmatively, Parker directed him to

return and verify Cadorette's identity.  At the time, DeLouya and Cadorette

were still sitting in their respective vehicles in the parking lot.  Montelongo

returned, spoke with Cadorette, confirmed his name, returned to his parked

vehicle, and radioed the information to Parker.  Montelongo's encounter

with DeLouya and his two encounters with Cadorette lasted only minutes,

and occurred between 4:15 A.M. and 4:30 A.M.

When Parker learned of Cadorette's identity, he was already en route

to Dick's, and arrived at 4:30 A.M.  He parked behind Montelongo's vehicle

5

which was behind the Cadorette and DeLouya vehicles.  At the time,
neither Cadorette nor DeLouya had left nor asked to leave.

Parker first approached Cadorette, requested identification, and
asked him his name, place of birth, and his business in the area.
Cadorette gave him a Quebec driver's license, and told him that his name
was Cadorette, that he was a Canadian citizen, that he was returning to
Manhattan from the casino, and that the driver of the other car was a friend
of his.  Parker asked: "Have you had a previous encounter with Border
Patrol?", and Cadorette responded, "No."  Parker returned to his vehicle,
verified the prior encounter with headquarters, and returned to Cadorette's
minivan.  When Parker confronted Cadorette with the information from
headquarters, Cadorette admitted that he lied.

Parker then requested permission to search Cadorette's car.  Parker
told Cadorette that he was free to decline, and Parker never threatened to
obtain a warrant if Cadorette refused consent.  Although Cadorette
consented, Parker did not then conduct a search.  Instead, he made an
exterior visual inspection of the vehicle, and then went to speak with
DeLouya.

Parker asked for identification, and DeLouya gave him a Quebec

driver's license.  Parker then asked his name, place of birth, and business in the area.  DeLouya told him that he was a Canadian citizen, that he was returning to Manhattan from the casino, and that he was resting.  While engaged in this brief conversation at DeLouya's driver's side window, Parker used his flashlight to inspect the interior for weapons, and saw two cell phones and a walkie-talkie on the center console.  He asked DeLouya why he needed the walkie-talkie, and requested permission to see it. DeLouya told him that he used it to speak with fellow travelers, that Cadorette also had one, and handed Parker the radio.  Parker then requested permission to search DeLouya's car, explained that DeLouya was free to decline, and DeLouya consented.  (Collectively, Statement Two).  Parker did not threaten to get a warrant if DeLouya refused consent. During the conversation, DeLouya was evasive and consistently looked toward Cadorette before answering.

After talking to DeLouya, Parker again returned to Cadorette.  He asked Cadorette whether he had a walkie-talkie, and showed him the one DeLouya had given him.  Cadorette replied that he did not, thus contradicting DeLouya's statement.  Parker confronted Cadorette with the contradiction, Cadorette admitted the second lie, and then showed Parker

a walkie-talkie that he had.  Throughout Parker's two conversations with Cadorette, Cadorette was evasive because he always looked toward DeLouya before answering, gave different answers to identical questions, seemed unsure as to whether he should answer, and acted suspiciously.

Parker next asked the men to step from their vehicles, and stand near Montelongo's vehicle.  Parker first searched Cadorette's minivan, and opened no bags or containers.  He found a walkie-talkie, one cell phone, and later seized a second cell phone from Cadorette's person.  He then searched DeLouya's Impala, and opened no bags or containers.  He seized the two cell phones he saw earlier in the center console which were in addition to the walkie-talkie that DeLouya had already given him.  Both men got back in their vehicles after the searches.  According to Parker, they could have revoked their consent and stopped the search at any time, and were free to leave.  However, Parker had not returned their licenses, and he used them to run license checks after the searches.  No more than twenty-five minutes elapsed from Parker's arrival until the completion of the searches.

Parker next called the State Police for back-up, and Troopers Barrett and Szymiokiak responded, arriving between 5:00 and 5:15 A.M.  Parker

8

sent the Troopers and Montelongo to the sensor site while he remained at Dick's.  Ten minutes later, Montelongo radioed that he and the Troopers had Plata in custody.  Montelongo told Parker that Plata had three large duffle bags of marijuana, a cell phone, and a walkie-talkie of the same make and model as those possessed by DeLouya and Cadorette.

While the Troopers and Montelongo were gone, Parker stood outside of his vehicle two car lengths from where Cadorette and DeLouya were seated in their vehicles.  When Parker learned that Plata had been arrested, an hour and ten minutes had elapsed since Montelongo's initial encounter.  DeLouya and Cadorette were then under *de facto* arrest because they were no longer free to leave.

Parker next called for a canine handler who responded.  Parker removed DeLouya and Cadorette from their vehicles, and the canine sniffed the vehicles without incident.  Parker then formally arrested DeLouya and Cadorette for participating in a marijuana smuggling conspiracy and the possession of marijuana with the intent to distribute it. DeLouya and Cadorette were placed in formal custody at 5:30 A.M.

No weapons were ever drawn, but Parker, Montelongo and the Troopers were in uniform, and had holstered weapons that were clearly

9

visible.  While Parker was at Dick's, his overhead, exterior vehicle lights were activated.

After the defendants were formally arrested, Parker read each his *Miranda* rights, utilizing an I-214 Department of Justice, Immigration and Naturalization *Miranda* form (Exhibit 1).  He then asked DeLouya for biographical or pedigree information, but did not question him about the criminal conduct.  (Statement Three).  Thereafter, the State Police transported DeLouya to the Burke Border Patrol Station, and DeLouya remained in the processing area.  Pursuant to a Memorandum of Understanding between the Border Patrol and DEA, the DEA was contacted and Sinnegan responded.

Sinnegan arrived at 9:00 A.M., and interviewed all three defendants in turn, beginning with DeLouya at 9:15 A.M.  There were five policeman and DeLouya in the interview room.  DEA Special Agent Uller read DeLouya his *Miranda* rights from DEA Form 13-A (Exhibit 2).  After DeLouya acknowledged that he understood his rights and consented to speak, a subsequent interview lasted forty minutes.  DeLouya was uncuffed during the interview, and the questions were principally asked by Sinnegan.  DeLouya was evasive during the interview, but never expressed

10

discomfort.

Sinnegan asked DeLouya, *inter alia*, about the ownership of the cars. DeLouya said that he rented both cars with his credit card in his name as the sole driver the previous day in Manhattan from two different agencies, Hertz and Avis.  (Statement Four).  Sinnegan interviewed Plata last, and Plata said: he was hired to carry three duffle bags across the border and deliver them to an individual on the American side; there were two other carriers with him, and each had a fifty pound bag; the other two ran away; and, he did this four times in the past, and on one of those occasions six months earlier, the operation was aborted.

The DeLouya and Cadorette vehicles were driven to the Border Patrol station and impounded.  The DEA has written rules and regulations that require an inventory of impounded vehicles.  At Sinnegan's direction, an inventory was conducted that day.  Four additional cell phones were recovered from Cadorette's bags, and rental contracts were seized from each vehicle.

DeLouya submitted no affidavit or suppression hearing testimony in support of his claimed expectation of privacy in the person of Cadorette or Cadorette's vehicle.  That claim relies solely on his multiple statements to

the agents and the documents seized during the inventory search.  He was

the only driver listed on the rental contracts.

## III. **Background of DeLouya's Motion**

The factual background of DeLouya's motion has a direct bearing on

the pending issues.  He filed his motion after this court's decision in *Elliott*,

363 F. Supp. 2d 439 (N.D.N.Y. 2005), but before its decision in *Miller*, 382

F. Supp. 2d 350 (N.D.N.Y. 2005).  *Miller* was issued on the day of

DeLouya's suppression hearing, and the court directed the parties to

review it, and supplement their arguments.

Pursuant to the Local Rules, this district's standard Criminal Pretrial

Order ("CPO") was issued on December 22, 2004.  *See Elliott*, 363 F.

Supp. 2d at 442-446.  In conformity with the CPO, the government timely

filed its Rule 12 notice.  *See id.* at 443; FED. R. CR. P. 12(b)(4); L. R. CR. P.

14.1(b)(1); CPO, ¶ II(B)(1).  The government disclosed the substance of

DeLouya's oral statements which were recited in Sinnegan's report

attached to the notice.  *See Kelly Disclosure Ltr. & Sinnegan Report, Dkt.*

*Nos. 40, 47.*  The government also noticed its intention to introduce

physical evidence at trial including, *inter alia*, cell phones and walkie-talkies

that were consensually seized from the two vehicles and from the persons

12

of the defendants. *See Kelly Disclosure Ltr. at 2*. The government did not, however, express an intention to introduce the rental car records seized during the inventory. *Id.*

Subsequently, DeLouya timely filed his motion. Generically, he claimed that his statements and the physical evidence were inadmissible because they were tainted by his illegal arrest. Additionally, he claimed that his statements were inadmissible because they were involuntary and were not preceded by adequate *Miranda* warnings. *See Omnibus Mot., Dkt. No. 38*. He did not particularize which specific statements or evidence he sought to suppress, and his motion failed to include a factual recitation which, if true, would entitle him to relief. *See Elliott*, 363 F. Supp. 2d at 445; *see also* L. R. 12.1.

In response, the government addressed what *it* believed DeLouya was seeking to suppress; namely, his statement to Sinnegan (Statement Four), and the cell phones and walkie-talkie seized from DeLouya and the Chevrolet, but nothing else. *See Govt. Omnibus Mot. Resp., Dkt. No. 43, at 2, 6-8*. Expressing its view of the suppression issues, the government argued: DeLouya's investigative detention was reasonable as was the search of his car and the seizure of evidence; DeLouya consented to the

13

search; the evidence would have been inevitably discovered either during a

search of his vehicle as an incident of his subsequent arrest or as the result

of a vehicle inventory; he was properly advised of his *Miranda* rights prior

to the Sinnegan interview (Statement Four); and, he failed to assert facts

substantiating his claim that the Sinnegan interview was involuntary.  *Id. at

6-8*.  Consistent with its Rule 12 notice, the government did not address the

rental car records.  Oral argument on the motion return was well in

advance of the suppression hearing, and the court discussed *Elliott* and its

specificity requirements during the return.

The day before the hearing and in obvious response to both oral

argument and *Elliott*, DeLouya sought to remedy his earlier failures by filing

a letter detailing the hearing issues.  *See LaMarche Ltr., Dkt. No. 45*.

However, he still failed to particularize as required by Local Rule 12. 1, the

CPO and *Elliot*.  *See Elliott*, 363 F. Supp. 2d at 445.  For the first time, he

argued that the search of *both* vehicles was non-consensual and sought

suppression of the rental contracts.[1]  See *LaMarche Ltr. at 1-2*.

Additionally, he only argued that his detention following the first

---

[1]Although the government did not include the rental contracts in its Rule 12 notice, there was no prejudice since the parties were clearly on notice that they had been seized during the inventory search.

Montelongo conversation was unreasonable. *Id.* Therefore, he failed to

state any basis for suppressing his first statement. He repeated his

omnibus motion claims that his arrest was illegal, that he was not properly

*Mirandized*, that he did not voluntarily waive his *Miranda* rights, and, at

least tacitly, that his statements were involuntary because they were in

response to "law enforcement inquiries" that were "coercive." *Id. at 2.* He

did not, however, particularize his coercion claims. He offered no

argument or factual recitation that supported his conclusory assertion that

his statements were induced by physical or psychological coercion or were

the by-product of his diminished capacity.

Given the failure to adequately define the issues, problems surfaced

during the hearing that were consistent with the court's prior observations

and predictions in *Miller*. *See Miller*, 382 F. Supp. 2d at 350, 359-361. As

in *Miller*, there were multiple DeLouya statements made during the

encounter, and the court requested that DeLouya specify precisely what he

was seeking to suppress. He then stated that he did not seek suppression

of statements concerning "pedigree information." *See Supp. Hring.*

*Transcript ("T") at 65, 98-104; Dkt. No. 56.* After the testimony concluded

and for the first time, DeLouya claimed an expectation of privacy in

15

Cadorette's vehicle.  *Id. at 99.*  The government responded that he had not challenged the admissibility of evidence seized from Cadorette or his vehicle in either his omnibus motion or letter.  *Id. at 100-101.*  Accordingly, and in fairness to DeLouya who had not yet seen the *Miller* decision, the court gave him an opportunity to review *Miller* and file a supplemental submission describing "precisely what it is he seeks to suppress and why," paying particular attention to "issues of waiver, which are critical," and whether he contests the voluntariness of statements under due process principles.  *Id. at 102-104.*

In his supplemental submission, DeLouya sought suppression of all evidence obtained from both vehicles and all of his statements, solely claiming that they were tainted by his unlawful detention and arrest.  *See Delouya MOL, Dkt. No. 48, at 3.*  Furthermore, he stated: "Recognizing the court's recent decision in *U.S. v. Miller*, and the court's statements at the time of the suppression hearing regarding waiver of those issues not specifically raised, it is therefore understood that those issues not specifically raised are hereby waived."  *Id.*  However, his subsequent legal analysis was inconsistent with his suppression request.  Once again, and without particularity, he sought suppression of all statements.  Without

specific reference to the statements themselves, however, he argued that only the statements to Parker and Sinnegan (Statements Two-Four) were tainted.  *Id. at 8, 10-11.*  Apparently, he now concedes that Statement One to Montelongo is admissible.  Furthermore, the court must conclude that he has withdrawn his earlier concession that the pedigree information given to Parker (Statement Three) is admissible.

The government's supplemental response clarified its position regarding the searches, but lacked clarity as to the statements because it addressed only the post-arrest, Fourth Statement.  *See Gov't MOL, Dkt. No. 50.*  As to the seizure of all physical evidence other than the rental car records, the government asserted:  there was no search or seizure regarding the walkie-talkie given to Parker by DeLouya; the seizure of all non-rental car evidence from Delouya occurred during a reasonable investigative detention and was the by-product of consent or would have inevitably been discovered as a search incident to a lawful arrest, a vehicle search supported by probable cause, an inventory search, or a border search; DeLouya had no expectation of privacy in the Cadorette vehicle; pursuant to the inventory exception to the warrant requirement, '[t]he Government does not seek to introduce any evidence seized from closed

17

containers" (*see Gov't MOL at 10*); and, the post-arrest statement to

Sinnegan is admissible because DeLouya was properly advised of his

*Miranda* rights and because he failed to recite any facts substantiating his

claim of involuntariness.

## IV. <u>Waiver and Surviving Issues</u>

In *Miller*, the court discussed the concept of waiver as applied to

suppression analysis. *Miller*, 382 F. Supp. 2d at 364-365.  A party's failure

to raise a particular ground waives the right to challenge or support

admissibility on that ground. *Id. at 364* (citing *Indiviglio v. United States*,

612 F.2d 624, 630 (2d Cir. 1979); *United States v. Harrell*, 268 F.3d 141,

146 (2d Cir. 2001)).  However, the court is always free to consider an

unpressed theory as long as the record is sufficiently developed. *Miller*,

382 F. Supp. 2d at 365.

Waiver analysis also applies in the context of shifting burdens of

production and proof. *Id.* at 361-362, 365.  As to searches, a defendant

meets his burden of production when he alleges warrantless seizures

except when he challenges a search in a location where he has no

reasonable expectation of privacy. *Id.* at 362 (citations omitted).  As to

expectation of privacy, the defendant has both the burden of production

and proof.  *Id.* at 361-362, 379-381 (citations omitted).  As to statements

and Fifth Amendment *Miranda* analysis, a defendant meets his burden of

production when he alleges custodial interrogation in the absence of

warnings.  *Id.* at 362 (citations omitted).  The burden then shifts to the

government to prove *Miranda* compliance, either because there was no

custodial interrogation implicating *Miranda*, there was some exception to

the *Miranda* rule, or because the defendant was properly *Mirandized* and

waived his rights.  *Id.* (citations omitted).  As to statements and Fifth

Amendment voluntariness, a defendant's burden of production may well

vary according to the underlying circumstances.  If he asserts a custodial

failure to *Mirandize*, that assertion alone is sufficient to create a

presumption of compulsion which shifts the burden of proof to the

government.  *See United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998)

(citing *Oregon v. Elstad*, 470 U.S. 298, 307 (1985)).  However, if a

defendant concedes the existence of *Miranda* warnings, but contests

admissibility on other compulsion grounds, he must provide a factual basis

for his conclusion or he is not entitled to a hearing.  Such a factual basis

might include allegations of actual physical or psychological coercion or the

defendant's lack of competence.  *Mathurin*, 148 F.3d at 69.

19

Given this motion's confusing factual background, the court turns to a waiver analysis, beginning with DeLouya's four statements.  First of all, neither party has factually or legally analyzed those statements as four discrete events.  In his original motion, DeLouya generically sought to suppress "statements," claiming that:  they were the "fruit" of his illegal arrest; they were not preceded by adequate *Miranda* warnings; and, they were involuntary.  As to voluntariness, he asserted no facts suggesting actual physical or psychological coercion or his lack of competence.  While his claim that he was not properly *Mirandized* was sufficient to warrant a hearing, that assertion only shifted to the government the burden of proving *Miranda* compliance, either because there was no custodial interrogation implicating *Miranda*, there was some exception to the *Miranda* rule, or because the defendant was properly *Mirandized* and waived his rights. Thus, DeLouya waived any other compulsion claims.

Despite the court's warning and specific reference to *Elliot* during the motion return, DeLouya failed to adequately resurrect his non-*Miranda* compulsion claims with the generic assertion in his August 10 letter that his statements were the by-product of coercive law enforcement inquiries.  In turn, the government failed to focus on non-*Miranda* compulsion during the

20

hearing, presumably believing the defendant had waived such claims.  At the conclusion of the hearing, DeLouya asserted that he was not seeking suppression of his statement concerning "pedigree" information, presumably referring to Statement Three.  The court then told DeLouya to review *Miller*, paying close attention to waiver principles, and supplement his motion, with specificity, stating precisely what he was seeking to suppress and the legal basis for doing so.

In his supplemental submission, he re-instituted his request to suppress "all statements," but again failed to specify what "all statements" meant.  The court appreciates that in some cases such generalized language might suffice, but not here, and not in light of DeLouya's legal analysis.  He acknowledged reviewing *Miller*, and stated that he was expressly waiving issues he did not recite.  He then promptly claimed that "all statements" were subject to suppression because they were a by-product of his illegal detention and arrest, but then conceded that the limited initial encounter with Montelongo was reasonable and therefore legal.  Given his argument, Statement One is obviously not the fruit of an unlawful detention, and therefore not suppressible.  It is also clear from his supplemental submission that he has now abandoned or waived any claim

that any of his statements are inadmissible because of *Miranda* violations or because they were otherwise coerced.  Therefore, the sole issue regarding any of DeLouya's statements is whether they are tainted by unreasonable police conduct during the encounter leading to his arrest.

As to the searches, DeLouya clearly asserts that all searches and seizures are tainted by his unlawful detention and arrest.  As a subsidiary matter, an issue remains as to whether he has satisfied his burden of production regarding his right to contest the search of Cadorette himself or his vehicle, especially since DeLouya has failed to assert facts, by affidavit or otherwise, demonstrating that he had an expectation of privacy in either location.  Nonetheless, the court is satisfied that his supplemental submission and the suppression hearing testimony and exhibits are minimally sufficient to preserve the issue, and it is not waived.[2]

As for the government, one issue deserves comment.  The

---

[2]Parenthetically, the court notes that its entire discussion concerning suppression hearing specificity and waiver is limited to information readily available to the parties from the Rule 16 discovery and Rule 12 notice.  The court understands that unanticipated facts and issues may arise.  For example, unknown evidence or statements may surface during a suppression hearing, or the government might discover such evidence afterwards.  Whether the court permits a supplemental Rule 12 notice, additional hearings, or elects some other remedy will inevitably depend on the unique facts of each case.  Nonetheless, the court has previously observed that "no rule should be so strictly enforced that parties lose rights because of an unintentional failure to comply ..." *Elliot*, 363 F. Supp. 2d at 443.  Furthermore, the court has generally discussed possible sanctions for rule violations, including waiver, preclusion or some other order that satisfies the interests of justice.  *Id.* at 447.

government has made no claim that any of DeLouya's statements, post-*Miranda* or otherwise, are admissible because they were an independent act of free will, thereby purging the taint of any illegal detention or arrest. *See Florida v. Royer*, 460 U.S. 491, 499 (1983); *Brown v. Illinois*, 422 U.S. 590 (1975). Accordingly, that argument is waived.

In summary, the non-waived, surviving issues are as follows: (1) whether the escalating encounter leading to DeLouya's arrest was reasonable under Fourth Amendment standards; (2) whether any of DeLouya's statements were obtained during an unreasonable detention or arrest; (3) whether any evidence was impermissibly seized during a warrantless search or seizure in contravention of the Fourth Amendment; (4) whether DeLouya had a reasonable expectation of privacy in Cadorette's person or vehicle; and (5) whether, regardless of any Fourth Amendment violation, it was inevitable that the evidence would have been legally seized, either because it was in plain view, or because it was subject to seizure as an incident to a valid arrest, or because it was subject to seizure pursuant to a valid car search, or because it would have been discovered during an authorized inventory.

**V.  Legal Discussion**

The suppression analysis primarily hinges on two alternative issues; namely, the reasonableness of the escalating police conduct, and DeLouya's expectation of privacy in Cadorette's person and vehicle. However, other principles impact that analysis, and the court begins with a summary recital of those principles.

**A.  Preliminary Legal Principles**

**1.  Search and Seizure**

A search occurs if an individual manifests a subjective expectation of privacy in the object of the search, and if society recognizes that subjective expectation as reasonable.  *See Palmieri v. Lynch*, 392 F.3d 73, 81 (2d Cir. 2004) (citing *Kyllo v. United States*, 533 U.S. 27, 33 (2001)); *see also United States v. Jacobsen*, 466 U.S. 109, 113 (1984).  A seizure occurs when there is some meaningful interference with an individual's possessory interest in property.  *Id.* at 113.  Merely looking at what is already exposed to view is not a search absent conduct disturbing it.  *Palmieri v. Lynch*, 392 F.3d at 81 (citing *Arizona v. Hicks*, 480 U.S. 321, 328 (1987)).

DeLouya has satisfied his burden of production by alleging that evidence was seized during warrantless searches.  *See e.g.*, *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980).  Such searches are *per se*

24

unreasonable unless the government proves that specifically established and well-delineated exceptions apply.  *See United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Katz v. United States*, 389 U.S. 347, 357 (1967) (citations omitted).  Recognized exceptions include: consensual searches (*see Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)); searches incidental to lawful arrests (*see New York v. Belton*, 453 U.S. 454, 457 (1981); *United States v. Robinson*, 414 U.S. 218, 224 (1973); *Chimel v. California*, 395 U.S. 752, 762-63 (1969)); vehicle searches (*see Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*); *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Ross*, 456 U.S. 798, 825 (1982); *Chambers v. Maroney*, 399 U.S. 42, 48-49 (1970)*; Carroll v. United States*, 267 U.S. 132, 153 (1925)); inventory searches (*see Colorado v. Bertine*, 479 U.S. 367, 371-72 (1987); *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976)); and, plain view seizures (*see Arizona v. Hicks*, 480 U.S. 321, 326 (1987)).

Consensual searches are valid if the authorities obtain the voluntary, uncoerced consent of persons authorized to give it.  *United States v. Hernandez*, 85 F.3d 1023, 1028-29 (2d Cir. 1996).  Given the totality of the circumstances, the court must determine whether the consent reflected an

individual's free and unconstrained choice rather than his simple acquiescence to a show of authority.  *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1995) (citing, *inter alia*, *Schneckloth*, 412 U.S. at 227).  Knowledge of the right to refuse consent is a positive factor in assessing its validity.  *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

The scope of a consensual search is limited by the authorization given.  *Garcia*, 56 F.3d at 423.  A third party who possesses common authority over property may authorize a search.  *United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995).  The critical issue in third-party authorization is whether that party possessed a relationship to the search location sufficient to legitimize the search.  *See id.* at 185-186 (citation omitted).  A sufficient relationship inevitably exists if the party has joint access or control.  *Id.*  Furthermore, a reasonable belief by the police that a search is within the scope of the authorization and that the consenting individual was authorized to assent is sufficient.  The standard is one of objective reasonableness.  *Garcia*, 56 F.3d at 423; *see also Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990).  Voluntariness, scope and authorization are questions of fact, and the government bears the burden of proof.  *United States v. Gandia*, 424 F.3d

26

255, 265 (2d Cir. 2005) (citation omitted).

A search incident to a lawful arrest is a bright-line rule permitting a thorough search of the arrestee and areas within his immediate control for weapons and evidence.  *See Chimel*, 395 U.S. at 762-63.  Once a police officer lawfully arrests a recent occupant of an automobile, he may contemporaneously conduct a warrantless search of the passenger compartment, including containers, as an incident of that arrest.  *Thornton v. United States*, 541 U.S. 615, 124 S.Ct. 2127, 2130-31 (2004) (interpreting *New York v. Belton*, 453 U.S. 454 (1981)).

If the police possess probable cause to believe a readily mobile vehicle contains contraband or evidence of a crime, they may conduct a warrantless search.  *See Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999) (*per curiam*); *Ross*, 456 U.S. at 809; *Chambers*, 399 U.S. at 47-52*; Carroll,* 267 U.S. at 153-56; *United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004).  The search authorized is limited to locations that may contain the evidence or contraband the police have probable cause to seek, but may encompass the entire vehicle and its contents, including containers and packages.  *Gagnon*, 373 F.3d at 235.  The critical inquiry is whether the police "had sufficient knowledge or reasonably trustworthy information to

27

justify a person of reasonable caution in believing ... there was a 'fair probability that contraband or evidence of a crime' ...  would be found" in the vehicle or its contents.  *Id.* at 240 (quoting *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984); *see also Acevedo*, 500 U.S. at 580.

An inventory search of property lawfully seized and detained is authorized to ensure that the property is harmless, to secure valuable items, and to protect against false claims of loss or damage.  *See Whren v. United States*, 517 U.S. 806, 811 n.1 (1996) (citing *Opperman*, 428 U.S. at 369); *Bertine*, 479 U.S. at 372; *United States v. Mendez*, 315 F.3d 132, 137 (2d Cir. 2002).  The government must establish that the police were following standardized procedures or established criteria, and acting in good faith.  *See Bertine*, 479 U.S. at 372.  To prove standardized criteria, the government may rely on written regulations or testimony concerning standard practices.  *Id.* (citing *United States v. Thompson*, 29 F.3d 62, 65 (2d Cir. 1994)).

A plain view seizure is authorized if the police are lawfully in a position to view an object, if the object's incriminating character is readily apparent, and if they have a lawful right of access to the object.  *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993).  The police must have probable

28

cause to believe the object is contraband or constitutes incriminating evidence in order to seize it.  *Hicks*, 480 U.S. at 326.  There is no inadvertent discovery requirement.  *Bradway v. Gonzalez*, 26 F.3d 313, 318 (2d Cir. 1994) (citing *Horton v. California*, 496 U.S. 128, 129 (1990)).  If the doctrine's requirements are otherwise met, a police officer may seize evidence in plain view during a *Terry* stop.  *United States v. Hensley*, 469 U.S. 221, 235 (1985).

### 2.  <u>Statements</u>

DeLouya has waived any Fifth Amendment claim that his statements were obtained in contravention of his *Miranda* rights or as a result of coercive police tactics.  The waiver is effective even though he originally satisfied his burden of production by alleging, at least in part, custodial interrogation in the absence of *Miranda* warnings.  *See Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986); *Mathurin*, 148 F.3d at 69.  Instead, he argues that his statements should be suppressed because they are tainted by a Fourth Amendment violation; namely, his unlawful detention and arrest.[3]

---

[3]DeLouya's waiver is entirely reasonable since his custodial status governs the admissibility of his statements pursuant to either a Fourth or Fifth Amendment analysis.  In other words, if he was illegally detained when he spoke, his statements are subject to Fourth Amendment suppression regardless of whether he was properly *Mirandized*.  While the

During a *Terry* stop, an officer may ask questions to determine identity and to gather information confirming or dispelling his suspicions, and *Miranda's* custodial interrogation requirements do not apply. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Once a suspect is in custody, *de facto* or otherwise, the police may not interrogate unless *Miranda's* requirements have been fully met, and the suspect voluntarily waives his rights and agrees to speak. *See Yarborough v. Alvarado*, 541 U.S. 652, 124 S.Ct. 2140, 2147-49 (2004); *Thompson v. Keohane*, 516 U.S. 99, 102 (1995).

Post-arrest questions designed to collect biographical or pedigree information are permissible, and normally do not implicate the *Miranda* warnings. *See Rosa v. McCray*, 396 F.3d 210, 221 (2d Cir. 2005).

### 3. "Poisonous Fruit," Inevitable Discovery and Purging Taint

The exclusionary rule requires suppression of direct and indirect ("poisonous fruit") physical and verbal evidence obtained during, or as a direct result of, a Fourth Amendment violation. *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963).

---

distinction might make a difference if the government claimed that his statements were the result of an independent act of free will dissipating any Fourth Amendment taint, the government has waived that issue.

Under the inevitable discovery doctrine, illegally obtained evidence is admissible if the government can prove by a preponderance of the evidence that it would have ultimately or inevitably discovered the evidence by lawful means. *United States v. Cabassa*, 62 F.3d 470, 472-73 (2d Cir. 1995) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). To do so, the government must establish "that the evidence would have been acquired through an independent source absent the government conduct.... The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred." *Cabassa*, 62 F.3d at 473 (quoting *United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993) (emphasis in the original)).

In a similar vein, statements obtained after a Fourth Amendment violation may be admissible if the impermissible taint has been purged. *See United States v. Thompson*, 35 F.3d 100, 105 (2d Cir. 1994) (citing *Brown v. Illinois*, 422 U.S. 590, 603 (1975)). Relevant factors in determining whether a taint has been purged include *Miranda* compliance, the temporal proximity of the violation and statement, intervening circumstances, and the flagrancy of the official misconduct. *See*

31

*Thompson*, 35 F.3d at 105.  Again, the government has waived this

argument.

### B.  <u>Reasonableness of the Escalating Encounter</u>: <u>Police-Citizen Contacts, Investigative Detentions, and Arrests</u>

The Fourth Amendment guarantees the right to be free of

unreasonable seizures.  U.S. Const. amend. IV.  Police seizures are

constitutional when reasonable, and reasonableness "usually requires, at a

minimum, that the facts upon which an intrusion is based be capable of

measurement against 'an objective standard,' whether this be probable

cause or a less stringent test."  *Delaware v. Prouse*, 440 U.S. 648, 654

(1979) (internal footnotes and citations omitted).  Here, reasonableness

must be evaluated along a continuum which escalated from police-citizen

contact to temporary detention to custodial arrest, all in the context of the

border and the constraints imposed by the Fourth and Fifth Amendments.

Not every contact between the police and a citizen constitutes a

seizure.  When a police officer publicly approaches an individual and asks

questions, the encounter is consensual, and there is no seizure as long as

the individual is free to disregard the encounter and go about his business.

*Florida v. Bostick*, 501 U.S. 429, 434 (1991) (citing *California v. Hodari D.*,

499 U.S. 621, 628 (1991)).  Voluntary answers to such questions are admissible at a subsequent trial.  *Id.* at 434 (citing *Royer*, 460 U.S. at 497). The encounter remains consensual and beyond Fourth Amendment scrutiny unless the police restrain the citizen's liberty by means of physical force or a show of authority.  *Id.* at 434 (citing *Terry v. Ohio*, 392 U.S. 1, 19 (1968)).

Although an encounter's consensual nature is usually determined by an objective inquiry asking whether a reasonable person under the circumstances would feel free to leave, ultimately the test is whether the police conduct was coercive.  In other words, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Bostick*, 501 U.S. at 436 (citation omitted).  Any restraint of a citizen's liberty caused by a show of authority or force constitutes a seizure.  *Id.* at 434 (citing *Terry*, 392 U.S. at 19 n.16).

As long as the police refrain from behavior suggesting that compliance with their requests is required, they may ask questions, examine an individual's identification, and request consent to search

without altering the consensual nature of the encounter.  *Bostick*, 501 U.S. at 437 (citations omitted).  The display of a badge or holstered weapon does not constitute a seizure.  *United States v. Drayton*, 536 U.S. 194, 204 (2002); *Florida v. Rodriguez*, 469 U.S. 1, 5-6 (1984).  Questioning alone does not constitute a seizure unless it unreasonably prolongs an encounter.  *Mueller v. Mena*, 125 S.Ct. 1465, 1471 (2005).  Ultimately, the essence of a consensual police-citizen encounter is its voluntariness, and as long as it remains so, there are no durational limits.

When evaluating the consensual nature of an encounter, the court should analyze numerous factors, such as:  the display of a weapon; physical touching; language or tone indicating a show of authority and the need for compliance; and the retention of a drivers license, baggage or travel documents.  *See Royer*, 460 U.S. at 501; *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Even if police conduct transcends the bounds of a consensual encounter, it may still be reasonable if it is no more than an authorized temporary seizure, or investigative detention.  Thus, a citizen's movement may be restricted sufficiently to constitute a seizure, but the seizure may pass constitutional muster if based on a reasonable suspicion that the

34

individual is engaged in suspected criminal activity.  *Terry*, 392 U.S. at 30-31.  When determining whether a reasonable suspicion existed, the court must assess the totality of the circumstances and ascertain if the police had a particularized and objective basis for suspecting criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  A reasonable suspicion is more than a hunch, but less than probable cause, and considerably less than a preponderance of the evidence.  *Id.* at 274.  The relevant inquiry is not whether particular conduct reflects innocent or guilty behavior, but rather whether certain types of noncriminal acts are suspicious.  *See United States v. Sokolow*, 490 U.S. 1, 10 (1989).  So too, a suspect's suspicious behavior may be attributable to a traveling companion.  *United States v. Tehrani*, 49 F.3d 54, 59-60 (2d Cir. 1995).

A court must assess various factors related to the scope and duration of an investigative detention to determine whether it is converted into a *de facto* arrest.  If the police have a reasonable belief that a suspect is potentially dangerous, they may conduct a carefully limited area search for weapons.  *Michigan v. Long*, 463 U.S. 1032, 1050 n. 14, 1052 n. 16 (1983).  Furthermore, the fact that the police question a suspect or search his possessions during an investigative detention does not automatically

convert the encounter into a *de facto* arrest.  *See Royer*, 460 U.S. at 497-501; *see also United States v. Gori*, 230 F.3d 44, 57 (2d Cir. 2000).  Absent probable cause, the questioning may not become custodial interrogation nor may a search be predicated on a warrantless exception requiring probable cause.  *Royer*, 460 U.S. at 497-501.  A search, if consensually conducted, is permissible.  *Id.* at 501.  Other factors relevant to the scope of an investigative detention include whether a suspect's freedom of movement is restrained, the justification for doing so, and the amount of force employed to accomplish the restraint.  *See Tehrani*, 49 F.3d at 61.

There are durational limits to an investigative stop, and if the police exceed those limits they convert the stop into a *de facto* arrest which is impermissible absent probable cause.  Thus, the limits of an intrusion will vary according to the unique circumstances of the case, but "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop ... [and] ... the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 500; *see also United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004).  There is no bright-line rule, however, governing the length of an

36

investigative detention.  *United States v. Sharpe*, 470 U.S. 675, 685-686

(1985); *see also Tehrani*, 49 F.3d at 61 (declining to hold that a thirty

minute investigative detention is *per se* too long) (citing, *inter alia*, *United*

*States v. Davies*, 768 F.2d 893, 902 (7th Cir. (1985) (forty-five minutes

reasonable)); *see also Muehler v. Mena*, 125 S.Ct. at 1471 (three hour

search detention reasonable).  The test is simply whether the police, under

all of the circumstances, acted diligently and quickly to confirm or deny

their suspicions, *Sharpe*, 470 U.S. at 686, which is a question of fact.  *See*

*Tehrani*, 49 F.3d at 58.  A reviewing court "should take care to consider

whether the police are acting in a swiftly developing situation, and ... should

not indulge in unrealistic second-guessing."  *Sharpe*, 470 U.S. at 686; *see*

*also Gori*, 230 F.3d at 54-55.  In making the determination, the court should

consider the length, conditions and the availability of alternative

investigative techniques.  *Tehrani*, 49 F.3d at 58-59.  By the same token,

the police are not charged with delays caused by a suspect's evasive

actions.  *United States v. Montoya-Hernandez*, 473 U.S. 531, 543 (1985)

(citations omitted).

Arrest is the maximum intrusion on personal liberty and is authorized

if supported by probable cause.  *Michigan v. DeFillippo*, 443 U.S. 31, 36

(1979).  Probable cause is determined by reference to the totality of the

circumstances, and exists if the police have sufficient knowledge or

reasonably trustworthy information to justify a person of reasonable caution

in believing that an offense has been or is being committed.  *Gagnon*, 373

F.3d at 236 (citing *Gates*, 462 U.S. at 230-31).  Probable cause to search

relies on the same *Gates* totality standard, but focuses on a different

inquiry; namely, whether the facts and circumstances known to the police

are sufficient to create a reasonable belief that evidence of a crime, or

contraband, will be found in the place to be searched.  *See United States v.*

*Gaskin*, 364 F.3d 438, 456-58 (2d Cir. 2004).  Probable cause is evaluated

according to the facts known to the officer at the time, *see Devenpeck v.*

*Alford*, 125 S.Ct. 588, 593 (2003), and he may draw inferences from his

own experience.  *See Ornelas v. United States*, 517 U.S. 690, 699 (1996).

Under the "fellow officer" rule, there is a presumption in a joint investigation

that knowledge of one officer is attributable to all.  *See Illinois v. Andreas*,

463 U.S. 765, 772 n. 5 (1983); *Savino v. City of N.Y.*, 331 F.3d 63, 74 (2d

Cir. 2003).

    When assessing the existence of a reasonable suspicion or probable

cause, the court must obviously look at the whole picture, and no single

fact is dispositive of the inquiry.  There are, however, factors that courts

have traditionally cited as probative, including: (1) the possession of

objects used in criminal activity (*see United States v. Hamell*, 931 F.2d

466, 467-69 (8th Cir. 1991)); (2) lies and false information in response to

questions (*see Craig v. Singletary*, 127 F.3d 1030, 1046 (11th Cir. 1997);

*United States v. Garcia*, 179 F.3d 265, 269 (5th Cir. 1999)); (3) implausible,

conflicting, evasive or unresponsive answers to questions (*see Garcia*, 179

F.3d at 269; *United States v. Carrillo*, 902 F.2d 1405, 1412 (9th Cir. 1990);

*United States v. Ameling*, 328 F.3d 443, 448-49 (8th Cir. 2003); *United

States v. Martin*, 289 F.3d 392, 400 (6th Cir. 2002); *United States v.

Sholola*, 124 F.3d 803, 815 (7th Cir. 1997); *United States v. Bizier*, 111

F.3d 214, 218 (1st Cir. 1997); *United States v. Tarango-Hinojos*, 791 F.2d

1174, 1177 (5th Cir. 1986)); (4) furtive gestures or demeanor (*see Morales

v. Artuz*, 281 F.3d 55, 60 n. 2 (2d Cir. 2002); *Garcia*, 179 F.3d at 269;

*United States v. West*, 219 F.3d 1171, 1178 (10th Cir. 2000)); (5)

association with suspicious others (*see Tehrani*, 49 F.3d at 59); and (6) the

particular area or other geographical factors pertinent to the encounter (see

*Brinegar v. United States*, 338 U.S. 160, 177 (1949); *United States v.

Davis*, 458 F.2d 819, 822 (D.C. Cir. 1972)).

39

As to geography, the proximity of this encounter to the border is relevant.  Routine searches at the border or its functional equivalent are *per se* reasonable and there is no need for a warrant or probable cause. *United States v. Singh*, 415 F.3d 288, 293 (2d Cir. 2005) (citations omitted).  The border's functional equivalent is an inland point where international travel terminates.  Although it may include inland roadways, they do not qualify unless the traffic is predominantly international. *Id.* at 294.  Border patrol operations at non-border points or their functional equivalents are subject to stricter Fourth Amendment scrutiny, and full searches and arrests require probable cause. *Id.* (citations omitted).  Non-consensual, lesser intrusions require reasonable suspicion, but if such suspicion exists, the agents may ask about suspicious circumstances. *Id.* When assessing reasonable suspicion in the context of all of the circumstances, border patrol officers are entitled to draw on their own experience and training. *Arvizu v. United States*, 534 U.S. 266, 273 (2002).  Thus, there are factors unique to the border that may provide reasonable suspicion, including: (1) characteristics of the area of a stop such as its proximity to the border; (2) prior border experience in the area; and (3) information concerning illegal border activity. *United States v.*

40

*Singh*, 415 F.3d at 294; *see also United States v. Cortez*, 449 U.S. 411, 419 (1981).

### C. <u>Expectation of Privacy</u>

A defendant seeking suppression must prove that his own Fourth Amendment rights were infringed by the search or seizure he challenges. *Rakas v. Illinois*, 439 U.S. 128, 133 (1978); *see also Miller*, 382 F. Supp. 2d at 379-81 (collecting cases).  He must "demonstrate that he personally has an *expectation of privacy in the place searched*," and "that his expectation [of privacy] is reasonable, *i.e.* one that has a 'source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *United States v. Haqq*, 278 F.3d 44, 47 (2d Cir. 2002) (citations omitted and emphasis in the original).  Thus, a defendant may only assert his own legal rights and interests, and not those of third parties.  *Rakas*, 439 U.S. at 139 (citations omitted).  He does so if a search or seizure infringes an interest of his which the Fourth Amendment protects, and if he has a legitimate expectation of privacy in the invaded place.  *Id.* at 143.  Clearly, a property interest in the place searched or the items seized is a factor in the analysis, but not itself dispositive.  *United States v. Salvucci*, 448 U.S.

83, 91-92 (1980).

Generally, a person's expectation of privacy in a car is far less than his home because much of the interior of the vehicle is open to view. *See United States v. Paulino*, 850 F.2d 93, 95 (2d Cir. 1988). Of course, that does not diminish the fact that people may seek to keep private what otherwise would be publicly seen, nor does it mean that simply because someone owns or possesses property he has an expectation of privacy in the property . *See id.* at 96; *see also Rawlings v. Kentucky*, 448 U.S. 98, 105-06 (1980) (ownership alone insufficient to demonstrate expectation of privacy). As to vehicles, the defendant must establish that he had a subjective desire to keep his effects private, and that his subjective wish is one society finds reasonable. *Paulino*, 850 F.2d at 97.

A defendant must prove a sufficient relationship with both the vehicle and that part of the vehicle searched in order to establish an expectation of privacy. Thus, he must establish ownership or license from the owner to possess a vehicle in order to contest a search. *United States v. Sanchez*, 635 F.2d 47, 64 (2d Cir. 1980). Even if he is legitimately in a car, his status as a passenger or borrower may be relevant to his expectation of privacy in certain closed areas because he does not have the right to exclude others

from those areas.  *Cf. Rakas v. Illinois* 439 U.S. at 141, 143 n. 12, 148;

*United States v. Pena*, 961 F.2d 333, 337 (2d Cir. 1992); *Paulino*, 850 F.2d

at 96-97.  Most importantly, one who lends a car to another abandons any

legitimate expectation of privacy he may have.  *United States v. One 1986*

*Mercedes Benz, VIN WDBEA30D2GA143459*, 856 F.2d 2, 4 (2d Cir. 1988).

## VI. <u>Analysis</u>

From the time of Montelongo's initial encounter with DeLouya until

DeLouya's *de facto* arrest by Parker seventy minutes later, the agents'

actions were reasonable, and carefully graduated in response to events

that were rapidly unfolding.  Accordingly, DeLouya's Fourth Amendment

rights were not violated by the encounter which escalated from a

consensual police-citizen contact, to an investigative detention based on

reasonable suspicion, to an arrest supported by probable cause.

At 4:00 A.M. when the sensor alerted, Parker orchestrated the

agents' response according to his unique perspective derived from his

extensive training and past experience in border smuggling investigations.

The sensor alert itself was cause for him to believe that someone had

illegally crossed the border at a location where others had done so in the

recent past.  Additionally, it was reasonable for him to believe:  that the

transgressor was on foot, and that at least two others waited in close

proximity on the American side, one in a primary vehicle and one in a scout

vehicle; that all involved had cell phones and walkie-talkies to facilitate their

communications; and that the parking lot of Dick's Country Store was a

convenient rallying point for the vehicles because it was a public place in

close proximity to the border's sensor location.  Because of those

reasonable beliefs, he responded to the border and sent Montelongo to

establish surveillance across from Dick's.

When Montelongo saw two vehicles pull into the parking lot, park

behind one another, and shut off their ignitions, it was entirely reasonable

to cross the road to see what they were doing.  Despite DeLouya's contrary

argument, *see DeLouya MOL at 7, Dkt. No. 48*, Montelongo's initial

encounter had nothing to do with a vehicle stop requiring an articulable

basis to justify it.  Instead, Montelongo did nothing more than approach two

men sitting in parked cars in a public parking lot in order to find out what

they were doing there at 4:15 A.M. in the morning.  When he spoke to

DeLouya, the conversation lasted only minutes, it was limited to

ascertaining DeLouya's identity and his purpose for being there, it was

44

accompanied by no show of force whatsoever beyond the fact that Montelongo was clearly a policeman, and it ended when Montelongo returned to his car, and drove back across the road.  Although DeLouya could have started his ignition and driven away, he elected not to do so. Montelongo's initial contact with DeLouya was a consensual police-citizen encounter.  Therefore, DeLouya's conversation (Statement One) is admissible because:  it was made during a consensual encounter; it was the by-product of an unrestrained choice to speak; there was no custodial interrogation implicating *Miranda*; and DeLouya has conceded that he was not unlawfully detained at that time.

When Montelongo radioed Cadorette's identity and description to Parker, Parker's suspicions were reasonably aroused.  In addition to the arrival of a potential primary and scout vehicle at a location in close proximity to an illegal border crossing, he knew that Cadorette had recently been in the same area at the time of another illegal border crossing. Furthermore, he knew that the men's explanation for their presence at Dick's was suspicious.  They were traveling companions, but had driven eight or nine hours from New York City in separate cars to gamble. Because of his suspicions, he immediately headed for Dick's, and sent

45

Montelongo back across the street to verify Cadorette's identity.
Montelongo returned to Cadorette's vehicle and spoke with him, but not
DeLouya.  Therefore, during the fifteen minute encounter between
Cadorette, DeLouya and Montelongo, there was only one conversation with
DeLouya lasting only minutes.

Twenty-five minutes elapsed from Parker's arrival at 4:30 A.M. until
he completed his search of both vehicles.  An additional thirty minutes
elapsed before Montelongo's radio transmission regarding Plata's arrest.
Even though Parker did not formally arrest DeLouya when he received the
radio transmission, DeLouya was then under *de facto* arrest because he
was no longer free to terminate the encounter.  Given the totality of the
circumstances, the encounter during the first twenty-five minute interval
remained consensual.  Thereafter, the encounter was predicated on a
reasonable suspicion of criminal activity, and was reasonable in duration
and scope as an investigative *Terry* detention.  Alternatively, the entire
encounter was predicated on a reasonable suspicion of criminal activity,
and was reasonable in duration and scope as an investigative *Terry*
detention.

When Parker arrived, he immediately approached Cadorette,

repeated Montelongo's earlier questions, and additionally asked whether

Cadorette had recently encountered Border Patrol.  When Cadorette lied,

Parker returned to his vehicle, contacted headquarters by radio, and

verified his information.  He then returned to Cadorette's vehicle,

confronted him with the lie, and Cadorette admitted his prevarication.

When Parker then requested permission to search Cadorette's vehicle, he

explained that Cadorette was free to refuse consent, and made no coercive

threat that he would obtain a warrant if consent was refused.  Furthermore,

it was objectively reasonable for Parker to believe that Cadorette, the

vehicle's sole occupant and driver, was authorized to consent to the

search.  When assessing the reasonableness of Parker's actions and the

duration and scope of the encounter, Cadorette's statements, lies, and

suspicious and evasive behavior were attributable to his traveling

companion, DeLouya.

Without searching Cadorette's vehicle, Parker then turned to

DeLouya who was simply sitting in his vehicle as he had been since he first

pulled into the parking lot, ostensibly to rest as he had earlier explained to

Montelongo.  Parker's conversation with DeLouya was substantially

identical to that which Parker had with Cadorette, including his request for

permission to search (Statement Two).  As with Cadorette, Parker told DeLouya that he was free to deny consent and did not threaten to obtain a warrant.  When responding to Parker's questions, DeLouya also behaved suspiciously because he was evasive with his answers, hesitant with his responses, and constantly looked toward Cadorette before responding, all of which prolonged the encounter.

As Parker stood at the driver's side window talking to DeLouya and with the aid of his flashlight, he could plainly see two cell phones and the walkie-talkie on the center console.  Whether the encounter remained consensual as the court holds, or whether it had alternatively transformed into an investigative *Terry* stop based upon Parker's objectively reasonable suspicions, Parker was nonetheless authorized to conduct a visual inspection of the vehicle's interior.  Consequently, there was no search since Parker was in a public place permitted by the Fourth Amendment, and saw items readily apparent from that vantage point.  Alternatively, he was engaged in a legitimate investigative detention, had the right to inspect the vehicle's interior for weapons or contraband, and saw the items.  He then requested permission to see the walkie-talkie, and DeLouya handed it to him.  Although it is arguable that Parker caused the item to be moved

and that he, therefore, effectuated a seizure, it was nonetheless accomplished by DeLouya's unrestrained, consensual choice to hand it to him.  At that point, there was no unlawful detention nor impermissible search and seizure, and the walkie-talkie is admissible.  Furthermore, Statement Two is admissible because:  it was made during a consensual encounter; it was the by-product of an unrestrained choice to speak; and, there was no custodial interrogation implicating *Miranda*.  Alternatively, Statement Two is admissible because:  it was induced by questions reasonably related in duration and scope to the purposes of a lawful investigative detention; and because there was no custodial interrogation implicating *Miranda's* warning requirements.

Given the level to which Parker's suspicions had been aroused, it was entirely reasonable to return to Cadorette with further questions. Cadorette then compounded Parker's suspicions by lying about his possession of a similar walkie-talkie, and continuing to respond evasively. When Parker finished his exchange with DeLouya, requested that the men exit their vehicles, and conducted the searches, only twenty-five minutes had elapsed since Parker's arrival.  Since the search of both vehicles was consensual, the walkie-talkie and one cell phone seized from Cadorette's

49

vehicle and the two cell phones seized from DeLouya's vehicle are admissible.

Given the whole picture, the agents' conduct from Montelongo's first arrival through Parker's vehicle searches was not objectively coercive because there was no show of authority or force that caused a restraint of DeLouya's liberty.  A reasonable person in DeLouya's position would have felt free to ignore Parker and go about his business.  Parker did nothing more than ask questions, examine DeLouya's identification and request permission to search.  Parker did nothing to convey to DeLouya that compliance with those requests was required.  The border patrol vehicles did not obstruct the movement of the civilian vehicles, there were no weapons drawn, there was no physical touching, and there was no language or tone suggesting that compliance was mandatory.

While the searches and Parker's continued possession of DeLouya's license are factors pertinent to the restraint analysis, they must not be viewed in isolation.  And, while the test of reasonableness is an objective inquiry, there is nothing that precludes the court from assessing the subjective realities at the time.  Thus, DeLouya argues that when viewed objectively, the facts mandate the conclusion that he was subject to police

coercion, and that he was required to remain in the parking lot.  However, the court's objective assessment leads to the inescapable conclusion that DeLouya had every reason to remain in the parking lot for reasons other than police coercion.  He consistently explained that he was there because he had stopped to rest before making the eight to nine hour return trip to New York City.  Furthermore, and because the court credits the facts disclosed by Plata's subsequent arrest, both men knew there was no contraband in either car that the police would discover during a search. Therefore, they had every reason to remain where they were and cooperate with the police inquiries.  In any event, the test is not what they may have subjectively felt about the police conduct, but instead whether a reasonable, innocent person under similar circumstances would have concluded that his movement was coercively restrained.  A reasonable person would not have reached that conclusion.

As to the thirty minute interval between the searches and Plata's arrest, the encounter escalated to an investigative detention.  However, that thirty minute detention was reasonable in duration and scope since it was reasonably related to the suspicions that caused it, including those generated by the suspects themselves.  Parker's call to the Troopers for

assistance was reasonable given the additional need for manpower and the continued requirements of his investigation.  Unimpeded, DeLouya returned to his vehicle after the search.  While two more policemen arrived in marked police cars, they and Montelongo were immediately dispatched to the sensor location while Parker remained with the suspects.  Within thirty minutes, Parker knew:  that Plata was on foot and in possession of more than fifty kilograms of marijuana near the sensor alert; that Plata was in possession of a walkie-talkie identical to those possessed by the suspects; that Cadorette and DeLouya were driving what Parker reasonably believed to be a primary and scout vehicle in close proximity to the border; that Cadorette had recently been stopped in close proximity to a sensor alert under similar circumstances; that Cadorette had consistently lied in response to relevant police inquiries concerning his conduct; and that both men were evasive in their behavior.  In light of the quantity of marijuana seized from Plata, and under the totality of these circumstances, Parker had probable cause to believe that Cadorette and DeLouya conspired with Plata to possess with the intent to distribute marijuana. Therefore, at the time of Montelongo's radio transmission regarding Plata, DeLouya and Cadorette were legally under *de facto* arrest.

52

Following DeLouya's *de facto* and formal arrest, Parker fully advised

him of his *Miranda* warnings as did the DEA agents before his subsequent

interview at the Border Patrol headquarters.  Although the court has

already questioned whether DeLouya seeks suppression of the

biographical data supplied Parker (Statement Three), the statement is

admissible because it was in response to a solicitation for pedigree

information which does not implicate *Miranda*, and because it was not

tainted by an unlawful detention.  Furthermore, Statement Four is

admissible because:  DeLouya does not contest that it followed a full and

complete warning and waiver of *Miranda* rights; DeLouya does not contend

that the statement was coerced; and the statement was not the by-product

of an unlawful detention.

As to the walkie-talkie that DeLouya handed to Parker, it is

admissible because Parker engaged in no unlawful search that revealed

the existence of the walkie-talkie and because DeLouya consented to give

it to Parker.  Alternatively, Parker was engaged in an authorized

investigative detention, saw the walkie-talkie in plain view, and was

authorized to seize it because he reasonably believed it was evidence of a

crime.  For the same reasons, the walkie-talkie and cell phone seized from

Cadorette's vehicle are admissible.  The cell phone seized from

Cadorette's person at the time of his arrest is admissible because it was

seized as an incident to his authorized arrest, and because DeLouya had

no expectation of privacy in Cadorette's person.  The four cell phones

seized from Cadorette's bags and the rental contracts seized from each car

are admissible because they were discovered during an inventory

authorized by written DEA regulations and conducted at Sinnegan's

direction.  Despite the government's disclaimer that it does not seek

admission of evidence seized from closed bags, the court has ruled on the

admissibility of the four cell phones because the record is sufficiently

developed to permit the analysis.

Alternatively, all items seized from Cadorette's vehicle are admissible

because DeLouya has failed to satisfy his burden of proving that he had a

reasonable expectation of privacy there.  DeLouya's proof was limited

*solely* to the fact that he was listed as the authorized driver on the rental

contract issued one day earlier.  His asserted expectation is unreasonable

under the Fourth Amendment because: his name on a rental contract is

insufficient to demonstrate a property interest in the vehicle or the items

seized; his expectation of privacy in the vehicle's interior open to plain view

is diminished, especially since he has alleged no facts suggesting that the effects were his and he intended to keep them private; and because by loaning the car to Cadorette, he abandoned any expectation of privacy.

As to the government's inevitable discovery argument which presupposes an illegal detention, there is a distinction between the statements and the physical evidence.  While Statement One would be inadmissible, the others would not.  DeLouya concedes that there was no unlawful detention when he made Statement One.  As to the others, they would be tainted, especially since the government has waived any argument concerning dissipation of the taint.

On the other hand, all physical evidence would have been inevitably discovered.  The court reaches this inevitability conclusion with some trepidation because the test requires speculation about what would have happened if there was an unlawful detention at some point in the encounter, and in advance of the seizure of any of the evidence.  *See Cabassa*, 62 F.3d at 473.  Nonetheless, the court has already concluded that given DeLouya's explanation for his presence in Dick's parking lot, and because there was no contraband in his car nor had Plata yet been arrested, DeLouya did not intend to leave at any point during the

55

encounter.  Given that finding, the conclusion flows naturally that all

evidence would have been legally and inevitably discovered.  Thus, it

would be admissible on the basis of several alternative theories, including:

Delouya lacked an expectation of privacy in Cadorette's vehicle and

person; the evidence seized while at Dick's would have occurred because

of DeLouya's valid consent, or as an incident of his lawful arrest, or

thereafter because it was in plain view, or, given Plata's possession of a

walkie-talkie and Parker's familiarity with the *modus operandi* of smuggling

operations, because there was probable cause to conduct a vehicle

search; and ultimately, because all evidence would have been discovered

as a result of a valid inventory search.

## VII.  Conclusion

For the alternative reasons stated herein, it is hereby

**ORDERED** that the motion of Yan DeLouya to suppress four

statements made to the police is **DENIED**, and it is further

**ORDERED** that the motion of Yan DeLouya to suppress evidence

seized from his person, from the person of David Cadorette, and from

vehicles operated by DeLouya and Cadorette is **DENIED.**

**SO ORDERED.**

Date:   November 30, 2005
 Albany, NY

_____
Gary L. Sharpe
U.S. District Judge